IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTUAN TIMBERLAKE,              :
    Plaintiff                   :
  v.                              : Case No. 3:24-cv-109-KAP
SUPERINTENDENT SCOTT            :
KLINEFELTER, S.C.I. HOUTZDALE, *et al.*, :
    Defendants                  :

<u>Memorandum Order</u>

      As I previously noted, ECF no. 22, in May 2024 plaintiff Timberlake filed a complaint ghostwritten by Ernest Scott, a frequent filer of inmate complaints that allege the excessive use of force, alleging an excessive use of force against Timberlake at S.C.I. Houtzdale on October 10, 2022. After extensions of time Timberlake provided service copies in the fall of 2025 and service was made. After screening under the Prison Litigation Reform Act, 28 U.S.C.§ 1915A, what remained was a <u>Whitley v. Albers</u>, 475 U.S. 312 (1986)(Eight Amendment prohibits malicious and sadistic uses of force) claim against Tate, Sinclair, Yeager, and Love, the four defendants alleged to have participated in the use of excessive force. All other claims and defendants were dismissed for plaintiff's failure to state a claim.

      On the single remaining claim I issued an order under Fed.R.Civ.P. 56(f)(3) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986) directing the submission of the videotape of the incident described in the complaint, and directed the parties to submit argument or evidentiary material shedding light on what they contend the videotape shows, on or before January 31, 2026. Defendants responded, submitting the video record of the incident and a brief describing what they contend it shows minute by minute and narrates what the video shows. ECF no. 26, Defendants' Brief at 9-11.

      Timberlake responded with a 7-page handwritten letter brief that does three things: 1) it acknowledges Scott's authorship and advises that Timberlake doesn't know why Scott didn't "keep it basic" but that Timberlake would be submitting a motion for reconsideration of the dismissal of some the other claims; 2) it asserts that there were additional video records that were not submitted that would support his contentions; and 3) it gives Timberlake's interpretation of what the video record shows. Timberlake makes little or no attempt to describe any action by any individual defendant; he tacitly asserts that all the defendants are liable for participating in the use of force.

      Plaintiff of course can file whatever motion to reconsider he wishes. After review of the video record, summary judgment is entered for the defendants. Dealing with the claim that there is missing evidence that would show Timberlake's version is the true one,

1

I have and will continue to reject unsupported claims that "defense counsel in what otherwise is unremarkable litigation over a use of force claim have at the eleventh hour tampered with evidence." Washington v. Bregman, 2024 WL 1640634, at *4 (W.D. Pa. Apr. 16, 2024), *appeal dismissed*, No. 24-1823 (3d Cir. March 26, 2025); *see also* Carter v. Polito, 2022 WL 1126229 at *2 (W.D. Pa. Jan. 14, 2022), *report and recommendation adopted,* 2022 WL 807027 (W.D. Pa. Mar. 17, 2022), *aff'd sub nom.* Carter v. Wetzel, 2025 WL 985389 (3d Cir. Apr. 2, 2025):

> Carter also alleges in his objections, particularly in Exhibit L, that the videorecording of the unit from the fixed camera on the unit that was a key piece of evidence in my initial review was "tampered with (i.e. Photo Shopped)," and his movements, Polito's movements, the background witnesses, and the time stamp in the video have all been altered. There is no competent evidence in support of either assertion. It is black letter law that a party cannot defeat a properly supported motion for summary judgment by offering only conclusory allegations or denials. Hardwick v. Packer, 546 Fed.Appx. 73, 77 (3d Cir. 2013)(affirming summary judgment for corrections officer defendants against a claim of excessive use of force). It is apparent that Carter's recollection of events, discussed below, differs from the scene depicted by video. Differences between his recollection and the videorecord are not competent evidence that the videorecord is fraudulent.

Carter v. Polito, 2022 WL 1126229 at *2. Timberlake's claims that defendants have withheld evidence, to the extent they are claims that defendants have tampered with evidence would deserve attention only if there were some plausible basis for them. Timberlake's circular argument that there must be another video record showing Timberlake's version of events because Timberlake's version of events is true does not provide any reason to believe that a video record contrary to the handheld camera record submitted by defendants actually exists. What is evident is that there the exhibit submitted contains no video record of the events relevant to the events described in Timberlake's Complaint at ¶¶ 20-25. Timberlake obviously has seen (and been able to hear the audio in that video) that video because he describes it in his complaint. The import of that is discussed below.

The relevant Eighth Amendment law has not changed in the last four years, so I repeat what I said in Mayo v. Little, 2022 WL 977070 at *2–3 (W.D. Pa. Feb. 10, 2022), *report and recommendation adopted,* 2022 WL 974447 (W.D. Pa. Mar. 31, 2022), *appeal dismissed*, 2022 WL 16627502 (3d Cir. Sept. 14, 2022):

> The relevant law is well-settled: to restore or to maintain order, corrections officers are permitted to use force that would not be acceptable in other contexts. *See* Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (shotgun used against inmate plaintiff). Whitley v. Albers requires [the inmate plaintiff] to show at this stage of the proceeding that there is a genuine issue of fact about whether [the defendant corrections officer] acted "maliciously and sadistically for the very purpose of causing harm." *Id.* Excessiveness is

not the test – that is applicable to pretrial detainees, *see* Kingsley v. Hendrickson, 576 U.S. 389, 402 (2015) - nor is deliberate indifference, *see* Whitley v. Albers, id. The Court of Appeals has explained many times:

> The unnecessary and wanton infliction of pain is considered cruel and unusual punishment under the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 6, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). When evaluating excessive force claims, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. In making this inquiry, courts examine a number of factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of a forceful response." Brooks [v. Kyler], 204 F.3d [102] at 106 [(3d Cir. 2000)]. *De minimis* injuries may suffice to state a claim for excessive force. Id. at 103.

Proctor v. Burke, 630 Fed. Appx. 127, 131-32 (3d Cir. 2015). When evaluating the use of force,

> "[a] court (judge or jury) cannot apply this standard mechanically." [Graham v. Connor, 490 U.S.] at 397 [(1989)]. Instead, it requires "careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396. Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley [v. Hendrickson], 576 U.S. [389] at 397 [2015].

> We analyze these circumstances "from the perspective of a reasonable officer on the scene." Id. Running a jail is "an inordinately difficult undertaking." Turner v. Safley, 482 U.S. 78, 84-85, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). "Safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." Kingsley, 576 U.S. at 399 (internal quotation marks omitted) (quoting Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 326, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012)). Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Id. (internal quotation marks omitted) (quoting Graham, 490 U.S. at 397). And "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates an inmate's constitutional rights. Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) (internal quotation marks omitted) (quoting Johnson [v. Glick], 481 F.2d [1028] at 1033 [(2d Cir. 1973)]).

Jacobs v. Cumberland County, 8 F.4th 187, 194-95 (3d Cir. 2021)(jury issue presented when video showed officer striking inmate while inmate was defenseless and obeying orders). The video exhibit provided in this case does not let me hear audio for some coding

reason, but that is not material to the determination whether there was a malicious and sadistic use of force.

There are three videos, the first about two minutes long, the second about twenty, and the third about five. In the first, an officer in a white shirt is giving a briefing to seven officers, one of whom has a stethoscope and who is not in the same protective gear as the others. Each officer steps forward to display what gear he is carrying. Occasionally the white shirt turns to the person videorecording the scene and addresses the camera directly.

The second video begins with Timberlake already prone on the bottom bunk of a two bunk cell being restrained by four corrections officers, with at least one other corrections officer standing by in mask and respirator appropriate to use of OC spray. (According to the medical records at Exhibit B, Timberlake had refused to comply with some order while he was in a previous cell and had been sprayed with OC and had a device described as an EBID used on him. Timberlake agrees with that, and refers to it in his summary judgment submission as covering his widow with a bed, although in his Complaint he asserts that at the precise moment he was sprayed he was complying with orders. He also asserts in his summary judgment submission that it was during this off-camera incident that officers repeatedly hit him with the EBID, which he describes as an "electric shield." As the record shows, Timberlake had no medical restriction as to either OC spray or an EBID.)  A white shirt stands by as the officers cut off Timberlake's orange jump suit. At approximately the five minute mark Timberlake is moved to a supine position and an officer wipes blood off a small laceration on Timberlake's forehead. Timberlake nods and speaks. (Timberlake asserts in his summary judgment submission that it was at this point that officers "jump on me violently" and "bust my forehead" and started punching him on both sides of his face while other officers blocked the camera. It is certainly possible that this is when the laceration on Timberlake's forehead occurred, but the video refutes any possibility that there could be multiple punches while officers screen the camera.) The white shirt takes a photograph of Timberlake's face. At about six minutes officers get the naked Timberlake to his feet, shackled at the ankles and cuffed behind his back, move him to a kneeling position in the cell and take the shackles off his ankles and close the door to the cell. An officer directs Timberlake to back up to the cell wicket to be uncuffed and he is uncuffed at approximately the eight minute mark. Timberlake attempts without success for some time to cover the window to the cell with some translucent material (defendants assert that it is a mattress cover) that allows his outline to be seen when he is close to the window and he repeatedly comes to the window and says words and points to someone (in a white shirt) outside the cell. This continues almost without cessation for some minutes at different levels of vehemence. Timberlake sometimes addresses the camera directly. The cell has a fixed-point camera above the door.

At approximately the eighteen minute mark two officers equipped with respirator gear approach the cell. Defendants assert that they then spray OC gas into the cell to get Timberlake to comply with orders to "cuff up." The use of spray cannot be seen clearly but from the position of the officers at the door it lasts at most a second or two, after which the two officers withdraw. A second or two later, after the use of OC spray, Timberlake stops talking, puts his hand to his mouth for a second and in no apparent distress shakes his head, then turns and sits down at the wicket to be cuffed behind his back and tethered. Two officers grasp Timberlake's upper arms and escort him out; another officer puts a quilted pad or blanket over Timberlake's back and drapes it around him as he is walked across the common area outside his cell down a hall, across another common area, and to another cell. This cell also has a fixed-point camera above the door.

At approximately twenty minutes one officer (defendants assert it is someone from the medical unit) with respirator gear on wipes Timberlake's forehead and face, then puts what looks like a blood pressure cuff on Timberlake's left upper arm. Timberlake maintains an almost nonstop oration directly to the camera and the officer on his right. A white shirt takes more pictures of Timberlake's face and the person from medical removes the blood pressure cuff and points what appears to be an infrared "radar gun" type of thermometer at Timberlake's forehead. He leaves. Timberlake is backed up to the wicket, uncuffed, and left alone in a cell without a mattress cover.

The third video is five minutes of Timberlake standing at the door to his cell addressing the handheld camera or standing silent with no signs of distress. The small unbandaged laceration is not bleeding. The medical record indicates that the only injury to Timberlake is the laceration on his forehead.

The dispositive law is summarized in Hudson v. McMillian, 503 U.S. 1, 9–10 (1992):

When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. See *Whitley, supra,* 475 U.S., at 327, 106 S.Ct., at 1088. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today. See *Estelle, supra,* 429 U.S., at 102, 97 S.Ct., at 290 (proscribing torture and barbarous punishment was "the primary concern of the drafters" of the Eighth Amendment); *Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1879) ("[I]t is safe to affirm that punishments of torture ... and all others in the same line of unnecessary cruelty, are forbidden by [the Eighth Amendment]").

That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. See *Johnson v. Glick,* 481 F.2d, at 1033 ("Not every push or shove,

even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort " 'repugnant to the conscience of mankind.' " *Whitley,* 475 U.S., at 327, 106 S.Ct., at 1088 (quoting *Estelle, supra,* 429 U.S., at 106, 97 S.Ct., at 292) (internal quotation marks omitted).

*See also* Wilkins v. Gaddy, 559 U.S. 34 (2010)(ultimate question is not whether injury is *de minimis* but the intent behind use of force). As the Court of Appeals observed in Reyes v. Chinnici, 54 Fed. Appx. 44, 48 (3d Cir.2002): "There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically." On the other hand, the gratuitous use of force is almost certain to be excessive. Irby v. Clearfield County Jail, 2020 WL 14029803, at *2 (W.D. Pa. June 5, 2020), *report and recommendation adopted,* 2020 WL 14029798 (W.D. Pa. June 23, 2020). And as in Smith v. Mensinger, 293 F.3d 641 (3d Cir.2002), it is error to discount an otherwise unrefuted claim of a beating only for lack of injury because, according to Reyes v Chinnici, 54 Fed. Appx. at 48, "only a jury could determine whether the plaintiff's allegations were credible given the apparent lack of injuries."

    But expending scarce time on a jury trial does not turn on how lurid a tale of beatings an inmate can offer when there is incontrovertible video evidence -direct or indirect- that there could have been no sadistic use of force. Timberlake's claim to have been punched in the face in the second video clip is absolutely refuted by the video itself. Timberlake does not claim to have been punched in the earlier encounter. (If he did the absence of **any** injury would equally disprove it.) What Timberlake claims about the use of force in the first incident, the one that is not on video, is that OC spray was used and he was shocked despite his moving to comply with the order given to him. But use of nonlethal force like OC spray or an EBID are not *per se* excessive, much less sadistic. They are intentionally nonlethal and are designed to inflict pain but present no danger of injury to most persons beyond that transitory infliction of pain. Of course they can be used sadistically, because even sunshine can be used sadistically. See Hope v. Pelzer, 536 U.S. 730, 738 (2002). But given Timberlake's description itself there is no evidence of that. By his account the use of OC that is not captured on video would have been a short burst into his cell before officers entered, not the emptying for no reason of a can of gas on an inmate who was not being extracted from a cell. And the use of a shield to physically control Timberlake before his cuffs were on -and that is the scenario consistent with Timberlake's account- is by definition a use of force to gain control of the inmate and therefore not malicious or sadistic. Even if in Timberlake's eyes it was excessive or in a jury's eyes unnecessary, the element that must be present is evidence of a "malicious and sadistic" intent, and there is none.

The Clerk shall enter summary judgment for the remaining defendants and mark this matter closed.

DATE: February 2, 2026

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel and by U.S. Mail to:

Antuan Timberlake MS-7506
S.C.I. Fayette
50 Overlook Drive
LaBelle, PA 15450